UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-4541 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ST. PAUL LUTHERAN CHURCH AND SCHOOL, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric Moore served as the principal of Defendant St. Paul Lutheran Church and School from July 1, 2019, until he resigned on June 30, 2020. Moore alleges that various members of the school community harassed him based on his race. The harassment, he claims, created a work environment so toxic that he was forced to resign after only a year on the job.

He filed a claim against the school under Title VII. St. Paul has moved to dismiss under Rule 12(b)(6), arguing that the complaint is factually insufficient and thus does not state a plausible claim for relief. For the reasons stated below, St. Paul's motion is granted in its entirety. The Court grants Plaintiff leave to file an amended complaint.

### Background

On July 1, 2019, Plaintiff Eric Moore began a new job as the principal of St. Paul Lutheran Church and School. *See* Cplt., at ¶ 10 (Dckt. No. 1). St. Paul is a small religious school located in the Austin neighborhood of Chicago. *See* St. Paul Lutheran School & Church, https://www.stpaulaustin.com/ (last visited May 27, 2021). It serves students in kindergarten through eighth grade. *Id.*

Moore had a rocky tenure at St. Paul.  He experienced a series of conflicts with different members of the school community.  According to the complaint, Moore butted headed with a meddlesome former principal, endured conflict with the chair of the Board, experienced problems with teachers and other staff, and so on.  Moore is African American, and he characterizes those conflicts as racially motivated harassment.  *See* Cplt., at ¶ 2 (Dckt. No. 1).

Before diving into Moore's allegations, the Court notes that the complaint is a little uneven.  In some places, it provides plenty of detail and context and tells a coherent story.  In other places, it's hard to tell exactly what Moore is alleging.  The Court has done its best to summarize Moore's allegations and identify where details and context are missing.

**Conflict Surrounding Glenn Kuck's Role at the School**

When Moore arrived for his first day of work on July 1, 2019, he found Glenn Kuck, the school's former principal, sitting in his office.  *Id.* at ¶ 18.  Kuck still volunteered at the school, and he told Moore that as part of his volunteer efforts, he was planning to continue performing certain duties that were typically assigned to the current principal.  *Id*. at ¶¶ 11, 18.  The duties included "taking care of employee benefits, coordinating and monitoring the lunch program and reviewing bank statements and teacher-submitted paperwork to reconcile for reimbursements."  *Id*. at ¶ 18.  The complaint doesn't reveal how Moore responded.

Over the course of the summer, Kuck continued to hang around Moore.  Every morning, from July 1 to July 23, Kuck waited in Moore's office to greet him when he arrived.  *Id*. at ¶ 22.  Kuck also requested to meet with Moore every day, so the two of them could discuss what Moore was doing, and how things were going with the school.  *Id*. at ¶ 23.  Moore claims that he "politely" declined those requests.  *Id*. at ¶ 24.  As the summer wore on, Kuck also began to

"scrutinize[]" Moore and to "questio[n] his decisions." *Id*. at ¶¶ 16–17. For example, Kuck took issue with Moore throwing out certain old pieces of furniture in Moore's office. *Id*. at ¶ 17.

Moore also implies that at some point during the summer, he learned that Kuck was still making certain decisions about how the school should be run. For example, Moore alleges that "[e]ven though Mr. Kuck was supposedly a volunteer, he had decision-making authority that clearly pervaded the authority given to Moore." *Id*. at ¶ 15. However, Moore does not provide any examples of the kind of decisions he believed Kuck was making.

Things came to a head between the two men on July 23. *Id*. at ¶ 19. That day, Kuck came into Moore's office and told Moore that "he needed to move things around because Mr. Kuck could not find anything." *Id*. In response, Moore told Kuck that "he was the Principal of the school and not Mr. Kuck." *Id*. at ¶ 20. Apparently Kuck responded by telling Moore that he "should have involved teachers in the purchase of new student desks." *Id*. at ¶ 21. The complaint doesn't offer any details about the dispute about the purchase of new desks.

About two weeks later, on August 6, 2019, Moore called an emergency school board meeting to discuss Kuck's "constant interference with him in his role as Principal of St. Paul." *Id*. at ¶ 25. It's not clear from the complaint exactly what Moore wanted the Board to do. Maybe he wanted to ask them to stop consulting Kuck when it came to important decisions. Or, maybe he thought he needed the Board's permission to have Kuck stop volunteering at the school.

In any case, the meeting did not go smoothly. During the meeting, the chair of the Board, Harry Strong, "attempted to intimidate Moore in front of the people present" by "making threatening faces to him" and stating that Moore's wife "was doing charity work by being

married to him." *Id*. at ¶¶ 26–27. And ultimately, "[d]espite Moore's requests, the Board was unwilling to have Mr. Kuck leave." *Id*. at ¶ 28.

**Conflict Surrounding Ashley Strong's Resignation**

At some point during the summer of 2019, Ashley Strong – a pre-K teacher at the school, and the daughter of Board President Harry Strong – submitted her resignation. *Id*. at ¶ 29. The complaint provides no detail regarding when Strong resigned, or what reason she gave for her resignation.

However, Strong's resignation caused some tension between Moore and other members of the school community. Moore alleges that when he arrived at the school on August 14, he found Harry Strong (again, the Board President), Emma Nichols (another Board member), and Beverly Wilcher (the mother of a current preschooler) in the foyer. *Id*. Moore alleges that the three of them were praying out loud for Moore to be removed as principal because of his role in Ashley Strong's resignation. *Id*. Moore does not allege how he responded. Nor does he explain why those three people believed he was responsible for Strong's departure.

On August 20, Ashley Strong "tried to rescind her resignation." *Id*. at ¶ 30. Two days later, Moore met with her, presumably about the possibility of her coming back to teach at St. Paul. *Id*. at ¶ 31. During that meeting, Strong explained that she had resigned because Moore was "demeaning" toward her, and because "he never tried to know her or the purpose of St. Paul." *Id*. She also allegedly told Moore that he was "not a Christian" and that he "used too many fancy words." *Id*. at ¶ 32. Moore does not allege how he responded to those accusations.

**Conflict Surrounding Lesson Plans**

On September 13, 2019, Moore attended a faculty meeting. *Id*. at ¶ 33. It's not clear from the complaint whether Moore normally attended faculty meetings, or whether this meeting was an exception.

In any case, Moore alleges that one of the teachers, Mark Bersie, "verbally accosted" him during the meeting in front of all the other teachers. *Id*. Specifically, Bersie told Moore that "a Board member, Anita Alic[e]a, told all St. Paul teachers that they did not have to do lesson plans." *Id*. Moore doesn't give any context for Bersie's statement. Maybe Moore wanted all teachers to do lesson plans, and Bersie was objecting. Regardless, Moore gave Bersie a "documented verbal warning for his insubordination." *Id*. at ¶ 34.

**Conflict Surrounding Linda Johnson's Resignation and Reinstatement**

On October 17, a third and fourth grade teacher at the school, Linda Johnson, "unexpectedly abandoned her job." *Id*. at ¶ 36. Moore provides a few details about the circumstances surrounding Johnson's resignation. He alleges that Johnson told him that she was quitting "due to a student remaining at the school." *Id*. And that he "explained to Ms. Johnson that she must implement the IEP or face due process hearings." *Id*. at ¶ 38. But beyond that, things are hazy. Presumably, one of Johnson's students had an IEP that she did not want to implement. But it remains unclear what the IEP was, why Johnson didn't want to implement it, and why Johnson felt she had to quit as a result.

Shortly after Johnson quit, Harry Strong, the Board President, called Moore and "directed him to have the student's mother transfer him to another school." *Id*. at ¶ 37. Moore claims that he objected to Strong's request. *Id*. at ¶ 39. Then, on October 20, "he received an email from

Mr. Strong stating that Linda Johnson would return to St. Paul as a third and fourth grade teacher." *Id*.

**Conflict Surrounding Strong's Elimination of Title I Instructional Consultation**

On October 18, while the issues with Johnson were ongoing, Moore alleges that Strong "circumvented [his] authority by eliminating Title I instructional consultation pullouts during the day." *Id*. at ¶ 35. Moore provides no details regarding what a Title I instructional consultation pullout is, why Strong might have eliminated it, or why Strong's actions "circumvented" his authority.

**Conflict Surrounding the Board Firing Marquita Dixon**

About a week later, on October 23, Moore received a call from Israel Alicea, the husband of one of the Board members (Anita Alicea). *Id*. at ¶ 40. Moore alleges that Alicea called him about a woman named Marquita Dixon, who was employed by the school in some capacity. *Id*. Alicea asked Moore whether he had spoken with Dixon about "being able to play music for the children on Sunday," and indicated that he believed Moore "should get rid of" Dixon. *Id*. at ¶¶ 40–41. In response, Moore told Alicea that he had spoken to Dixon, and that Alicea should talk to the other Board members about Dixon's role at the school. *Id*. at ¶¶ 41–42.

A few minutes later, Moore received a call from Harry Strong telling him to fire Dixon. *Id*. at ¶ 43. Moore refused, and told Strong that "if he wanted her fired, he should put it in an email." *Id*. at ¶ 44. Shortly thereafter, the Board fired Dixon "over Moore's objection." *Id*. at ¶ 45.

**Conflict Surrounding Custodian Marcus Pass**

On October 24, Moore had a conversation with Ashley Strong, Harry Strong's daughter, who had quit and then was reinstated. *Id*. at ¶ 46.

6

Strong told Moore that she had spoken with two female parents, Beverly Wilcher (the mother whom Moore had found praying for his removal in the hallway a few months earlier) and Jaqueline Ortiz. *Id*. Wilcher and Ortiz told Strong that Marcus Pass, a school custodian, had made inappropriate comments to the two parents, and that they were planning to pull their children from the school as a result. *Id*.

In response, Moore told Strong to put her complaint in writing and then reached out to one of the women, Beverly Wilcher. *Id*. at ¶¶ 47–48. When Moore and Wilcher connected, Wilcher told Moore that Pass "made comments about her appearance and told her that she looked beautiful and that she should tell her husband that he had a fine wife." *Id*. at ¶ 50. Moore does not provide any more details about how he handled the situation with Pass.

A few days later, on October 29, three board members – Harry Strong, Anita Alicea, and Emma Nichols – went to Moore's office without an appointment. *Id*. at ¶ 51. The complaint implies, but does not directly state, that the three of them were there to discuss the situation involving Pass.

Moore alleges that during that meeting, the group "pepper[ed] him with questions." *Id*. He does not say what the questions were. He also alleges that Anita Alicea "started reading from the Board of Education Handbook about the responsibilities of a Principal and told Moore that she did not want him to talk to Donna Moss, former teacher at the school." *Id*. at ¶ 52. The complaint does not say who Donna Moss is, and what, if anything, she has to do with the situation involving Pass. Alicea also "threatened that she was going to take the matter" – again, presumably the situation involving Pass – "before the entire church." *Id*. at ¶ 53.

The next day, October 30, Moore spoke with another board member, Beverly Gage. *Id*. at ¶ 54. Gage told Moore that she had spoken to Alicea, and that Alicea had told her that "they,"

presumably the Board, "got" Moore, and that she was watching him. *Id*. Gage also indicated that she had several text messages from Alicea about Moore. *Id*.

**Moore Files a Complaint with the EEOC and Resigns**

On November 1, 2019, the day after Moore spoke with Gage, he filed a charge of discrimination with the EEOC. *Id*. at ¶ 58. At some point thereafter, he submitted his resignation effective June 30, 2020. *Id*. at ¶ 56.

On July 17, 2020, Moore received a notice of right to sue from the EEOC, and on August 3, 2020 he filed this lawsuit. *Id*. at ¶ 59. He brought one count against St. Paul under Title VII, claiming that he had been subjected to a hostile work environment because of his race. *Id*. ("The conduct of the above-mentioned individuals has clearly created a hostile work environment for Moore at St. Paul solely based on his race."); *see also id*. at ¶ 56 ("As a direct and proximate result of St. Paul's conduct, Moore was constructively discharged by St. Paul.").

**Discussion**

St. Paul moved to dismiss Moore's claim under Rule 12(b)(6), arguing that he has failed to state a plausible claim for relief. A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).

The Court begins by "taking note of the elements a plaintiff must plead to state [a] claim." *Ashcroft v. Iqbal*, 556 U.S 662, 675 (2009). Then, turning to the complaint itself, it "accept[s] the well-pleaded facts in the complaint as true," but ignores "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 680–81). Those well-pleaded factual allegations, taken together, must allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, they must

constitute a facially plausible claim for relief or, in other words, tell "a story that holds together." *Swanson v. Citibank*, 614 F.3d 400, 404 (7th Cir. 2010). Otherwise, the complaint must be dismissed. *See Iqbal*, 556 U.S. at 678.

**I.      Moore's Claim**

Moore alleges that St. Paul subjected him to a hostile work environment on the basis of race in violation of Title VII. "Title VII's general prohibition against race discrimination by employers includes a prohibition against creating a 'hostile or abusive work environment.'" *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citation omitted). To state a prima facie claim for a hostile work environment under Title VII, a plaintiff must allege: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Id.* (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005)).

St. Paul argues that Moore's claim must be dismissed because he has not alleged any facts supporting prong two. That is, the complaint does not offer sufficient facts to allege that the harassment was based on his race. *See* Defs.' Mtn. to Dismiss, at 5–8 (Dckt. No. 17). The Court agrees.

A hostile work environment, standing alone, is not enough to state a claim. A plaintiff must allege that the harassment was "based on membership in a protected class." *Alexander*, 739 F.3d at 982. In order for harassment to be "based on race," it must be racial in "character" or racial in "purpose." *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) ("The complained of conduct must have either a sexual or racial character *or purpose* to support

9

a Title VII claim.") (emphasis in original); *see also Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013).

Moore alleges no facts that support a plausible inference that the harassment he experienced was racial in character or racial in purpose.

Moore does not allege any behavior that could be considered racial in character. Harassment is racial in character when it is obviously connected to the person's race (*e.g.,* the use of racial slurs, or the use of racially charged symbols). *See Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896–97 (7th Cir. 2016); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). Moore does not allege that anyone at St. Paul used racial slurs or racially charged symbols, or engaged in any other overtly racist actions.

Moore does not allege any conduct that was racial in purpose, either. Harassment is racial in purpose when it is facially neutral, but motivated by racial animus (*e.g.,* being physically aggressive towards a co-worker on the basis of race). *See Cole*, 838 F.3d at 896–97. A plaintiff claiming that the harassment was motivated by race must point to some facts supporting that inference. For example, a plaintiff can allege that a defendant engaged in harassment that was racial in character, *and* harassment that was facially neutral, and that the two kinds of harassment were "intertwined." *Id*. at 896 (citing *Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001)). Alternatively, a plaintiff can point to instances of racism in the workplace generally, and argue that the work environment was so "tainted by overt racial hostility" that it's fair to assume that the harassment was racially motivated. *Id*. A plaintiff also can argue that they were subjected to harassment while their co-workers of other races were not. *See Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) ("One method of

demonstrating that harassment is based on sex is to provide evidence of discrepancies in how the alleged harasser treats members of each sex in a mixed-sex workplace.").

Moore alleges no facts that support a plausible inference that the facially neutral harassment he experienced was motivated by race. He does not point to any examples of overtly racist harassment of other people at St. Paul. Nor does he allege that he ever heard or observed anyone at St. Paul make a racially charged comment, take a racially motivated action, or do anything else that might support an inference that St. Paul was "tainted by overt racial hostility." *Cole*, 838 F.3d at 896. He does not point to similarly situated employees of different races who were treated differently, either. *Sheahan*, 189 F.3d at 533.

Moore argues that his complaint should survive because it alleges that the harassment was racially motivated. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 7–9 (Dckt. No. 23). But that blanket allegation is not enough. Moore must allege *facts* supporting the inference that those facially neutral actions were motivated by race. He cannot simply conclude that they were. Alleging a bare conclusion is not enough to state a claim. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Hancock v. City of Chicago*, 2019 WL 1399949, at *2 (N.D. Ill. 2019), *aff'd sub nom. Levan Galleries LLC v. City of Chicago*, 790 F. App'x. 834 (7th Cir. 2020) (holding that the statement that "above-described conduct of named defendants was committed upon [plaintiff] because his [sic] is an African American" did not state a claim because it did not "satisfy the notice requirements set forth by the Supreme Court in *Twombly* and *Iqbal*"); *Hicks v. City of Chicago*, 2017 WL 4339828, at *8 (N.D. Ill. 2017) ("The problem with this claim is that [Plaintiff] has not pled any *facts* that give rise to a plausible inference [of] intentional racial discrimination. In saying that the officers engaged in 'purposeful

11

discrimination against Plaintiff because of her race,' [Plaintiff] is merely offering a legal *conclusion*, which this Court need not accept.") (citations omitted) (emphasis in original); *McDonald by McDonald v. Haskins*, 1991 WL 61036, at *1 (N.D. Ill. 1991) (concluding that plaintiff did not state a claim because he "has failed to plead any facts, apart from his own race, from which the court can draw an inference that defendant's actions were at all motivated by plaintiff's race"), *aff'd*, 966 F.2d 292 (7th Cir. 1992).

In sum, Moore alleges no facts that might reasonably support his claim that he experienced harassment on the basis of race. He alleges harassment, but not *racial* harassment. Therefore, his claim is dismissed.

## Conclusion

For the foregoing reasons, the motion to dismiss is granted. The Court grants Moore leave to file an amended complaint by June 18, 2021.

Date: May 28, 2021

Steven C. Seeger
United States District Judge